**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MARY BETH WYSS,

        Plaintiff,

                                  Case No. 03-74571

v.                                   Hon. Gerald E. Rosen

KEMPER EMPLOYERS INSURANCE
COMPANY,

        Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING CROSS-MOTIONS TO REVERSE OR AFFIRM
ADMINISTRATOR'S DENIAL OF SHORT-TERM DISABILITY BENEFITS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on      September 8, 2006     

PRESENT: Honorable Gerald E. Rosen
United States District Judge

## I. INTRODUCTION

In the present suit, Plaintiff Mary Beth Wyss challenges the decision of the

Defendant claims administrator, Kemper Employers Insurance Company,[1] to deny her

claim for short-term disability benefits under a plan offered by her employer, the Henry

_____

[1]In its submissions to the Court, Defendant states that Kemper Employers Insurance Company was erroneously named as a party in Plaintiff's complaint. Instead, Defendant's response has been filed on behalf of Lumbermens Mutual Casualty Company as the issuer of the group disability insurance policy under which Plaintiff seeks to recover benefits.

Ford Health System.  This Court's subject matter jurisdiction over this case rests upon Plaintiff's claim for benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Presently before the Court are the parties' cross-motions to affirm or reverse Defendant's decision to deny short-term disability benefits to Plaintiff.  The parties agree that the "arbitrary and capricious" standard governs this Court's review of the challenged decision, although they disagree somewhat as to the degree of deference owed to Defendant under this standard.  Nonetheless, Plaintiff maintains that the decision here must be overturned even under a deferential standard of review, where (i) Defendant purportedly failed to give proper deference to the opinion of her treating physician, and (ii) Defendant instead relied on the opinion of a "peer review" physician who never met or examined Plaintiff, applied criteria beyond those dictated by the terms of the short-term disability plan, and reviewed a job description for a position different from the one actually held by Plaintiff.

The parties' cross-motions now have been fully briefed on both sides and are ready for decision.  Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not significantly aid the decisional process.  Accordingly, the Court will decide the parties' cross-motions "on the briefs," see Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan, following the guidelines set forth by the Sixth Circuit in Wilkins v.

2

Baptist Healthcare System, Inc., 150 F.3d 609, 619 (6th Cir. 1998).[2]  This Opinion and Order sets forth the Court's findings of fact and conclusions of law.  To the extent that any findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II.  FINDINGS OF FACT

Plaintiff Mary Beth Wyss was hired by the Henry Ford Hospital System on September 5, 2000, and was employed as a nurse case manager.  As of December 16, 2001, she was eligible for coverage under a short-term disability benefit plan (the "Plan") offered by her employer.  Under this Plan, benefits are paid in accordance with the terms of a group disability insurance policy issued by Lumbermens Mutual Casualty Company to the Henry Ford Health System, and claims for benefits are administered by a Lumbermens subsidiary, Kemper National Services.[3]

### A.    The Pertinent Plan Provisions

The Plan defines a "disability" as the insurer's "determination [of] a significant change in your physical or mental condition due to," *inter alia,* "[s]ickness."  (Plan at 6.)

_____

[2]Specifically, Wilkins holds that neither summary judgment nor a bench trial provides an appropriate procedural basis for resolving ERISA actions to recover benefits.  Rather, the Sixth Circuit suggested that district courts generally should review challenged benefit denials "based solely upon the administrative record, and [should] render findings of fact and conclusions of law accordingly."  Wilkins, 150 F.3d at 619.

[3]As noted earlier, this latter entity is misidentified in Plaintiff's complaint as "Kemper Employers Insurance Company."  Throughout the remainder of this opinion, the Court's references to the "Defendant" should be read as referring to the claims administrator, Kemper National Services.

This change in condition must, in turn, cause an "inability to perform, during the Benefit Qualifying Period and thereafter, the Essential Functions of your Regular Occupation or a Reasonable Employment Option offered to you by the Employer," with the result that the employee is "unable to earn more than 60% of [her] Pre-disability Weekly Income."  (Id.)

The Plan defines the "essential functions" of a position as those "functions which are normally required for the performance of an occupation, and which cannot be reasonably omitted or modified."  (Id. at 26.)  An employee's "regular occupation" is defined as "the activity which, immediately prior to the injury or start of the sickness for which [the employee seeks] benefits under This Plan," the employee was "regularly performing" and was "the source of [the employee's] income from the Employer."  (Id. at 29.)  The Plan clarifies, however, that a "regular occupation" is "not limited to the specific position you held with the Employer, but could instead be a similar activity that could be performed for the Employer or another employer, based on job descriptions provided by the Employer or included in the most current volume of the U.S. Department of Labor's Dictionary of Occupational Titles."  (Id.)

Under the plan, the insurer "reserve[s] full discretion and authority to manage the Group Policy, administer claims, and interpret all policy terms and conditions."  (Plan at 24.)  This discretionary power encompasses the authority to "[r]esolve all matters when a review has been requested," to "[e]stablish and enforce rules and procedures for the administration of the Group Policy and any claims under it," to "[d]etermine [a claimant's] eligibility for coverage," and to "[d]etermine whether proof of [a claimant's]

4

loss is satisfactory for receipt of benefit payments according to the terms and conditions of the Plan." (Id.)

**B.    The Records of Plaintiff's Medical Treatments**

Plaintiff's claim for short-term disability benefits stems from a viral respiratory infection she suffered in December of 2001. According to a letter she submitted to Defendant in June of 2002, this infection "led to an inflammation of [Plaintiff's] rib cage," a condition known as "costal chondritis," and caused her to experience "severe pain in [her] ribs at rest and with any exertion such as pushing, pulling, or lifting." (Admin. Record at 72.) Plaintiff further stated that her pain was "exacerbated with sneezing, laughing, coughing, taking a deep breath, laying or sitting against any surface, jostling movements, and wearing tight/restrictive clothing." (Id.)

Plaintiff received treatment for this condition from Dr. Bruce Miller, who apparently was her treating physician dating back to at least 1998. It is fair to say, however, that the administrative record contains only scant materials documenting Dr. Miller's examinations or treatments of Plaintiff, whether for her allegedly disabling condition or any other. Specifically, the record includes Dr. Miller's (largely illegible) notes of Plaintiff's visits to his office on May 8, May 28, June 7, and June 27, 2002 for treatment of her condition. (See Admin. Record at 100, 102.) So far as can be discerned from these records, Dr. Miller diagnosed Plaintiff as suffering from fibromyalgia and costal chondritis, with a history of asthma, and he prescribed local injections of Xylocaine and medications for pain (Flexeril), inflammation (Prednisone), and depression

(Wellbutrin).  (See id. at 100.)  The doctor's entry for June 27, 2002, however, cited Plaintiff's report that she was "slowly getting better," with her pain not continual and less intense, but that the pain increased with pushing, pulling, lifting, or wearing tight clothes. (Id. at 102.)  Following this visit, Dr. Miller reiterated his diagnosis of costal chondritis, fibromyalgia, and asthma, and he recommended that Plaintiff continue with her medication and physical therapy and that she remain on disability leave.  (Id. at 102-03.)

The record also includes a handful of other materials from Dr. Miller.  First, he prepared a letter "To Whom It May Concern" in January of 1998, well before the onset of the allegedly disabling condition at issue here, stating that Plaintiff had the following work restrictions:  (i) no lifting, pushing, or pulling greater than 20 pounds, (ii) no kneeling or squatting, (iii) the ability to change positions between sitting and standing as needed, (iv) a cushioned chair with back support, (v) an inability to remain flexed 90 degrees at the waist for longer than a minute, and (vi) no midnight shift.  (Id. at 51.)  In addition, Dr. Miller completed a Family and Medical Leave Act certification form at some point, stating that Plaintiff suffered from severe costal chondritis with a history of underlying fibromyalgia, that this condition commenced in January of 2002 and typically lasted six months, that she was "unable to work at all at this time" and was likely to remain unable to work for six to twelve weeks, and that Plaintiff was undergoing a treatment of coordinated medication and physical therapy.  (Id. at 62.)  Finally, Dr. Miller completed a "Physician's Update/Follow Up Form" on May 28, 2002, again diagnosing Plaintiff as suffering from severe costal chondritis with underlying fibromyalgia, as well

6

as severe tenderness over her chest wall and muscle spasms in her chest, back, and neck, and opining that Plaintiff would be able to return to full-time work status in six to twelve weeks. (See id. at 101.)

Apart from these records and documents from Dr. Miller, the record includes four other documents bearing upon Plaintiff's medical condition. First, there is a report of a June 16, 1999 chest x-ray, indicating that Plaintiff's heart, mediastinum, pulmonary vasculature, and lungs appeared normal. (See id. at 66.) Next, there is a record of blood work from February 27, 2002 that does not disclose any particular concerns. (See id. at 64.) In addition, Plaintiff underwent a bone scan on February 13, 2002 that revealed "[n]o abnormal tracer uptake . . . in the ribs" but "[i]ncreased uptake in the shoulders, likely representing degenerative changes," as well as "[d]if[f]use increased uptake in the breasts, likely secondary to fibrocystic disease." (Id. at 65.) Finally, there is a record of Plaintiff's apparent June, 2002 visit to an emergency room at a hospital in Bellefontaine, Ohio, but this record is almost entirely illegible. (See id. at 104.)

## C.      Plaintiff's Claim for Short-Term Disability Benefits

On May 15, 2002, Plaintiff filed a claim for short-term disability benefits under the Plan, stating that her first full date of absence from work would be May 20, 2002. (See id. at 1.) As she explained in a subsequent letter, while her allegedly disabling condition traced back to a viral respiratory infection in December of 2001, she remained on the job for five months despite experiencing severe pain, side effects from her medication, and fatigue. (See id. at 72.) When her health failed to improve over this period, her

7

physician, Dr. Miller, recommended a medical leave to avoid aggravating her condition, and her supervisor purportedly agreed that a medical leave was warranted "because [her] work performance was negatively affected by the illness." (Id.)

On June 3, 2002, Defendant notified Plaintiff that her claim for short-term disability benefits had been denied. (See id. at 57-58.) As grounds for this decision, Defendant cited the failure of Plaintiff's physician, Dr. Miller, to provide any pertinent information regarding Plaintiff's current medical condition. (See id. at 57.) Instead, despite repeated requests, Dr. Miller apparently had provided only (i) his January 1998 letter regarding Plaintiff's work restrictions at that time, and (ii) the records of Plaintiff's bone scan and blood work in February of 2002. (See id. at 12.) Plaintiff was advised of her right to seek reconsideration of Defendant's denial of benefits, and was urged to provide "objective medical data" bearing upon her claim of disability, such as office notes, x-ray reports, or consultation reports. (See id. at 57-58.)

Plaintiff timely appealed this decision, and Defendant received the remainder of the above-cited medical records in connection with this appeal. All of these records were forwarded to Dr. Sheldon Zane, a peer review physician specializing in rheumatology, who was asked to offer an opinion as to whether these materials contained findings that would support a functional impairment that prevented Plaintiff from performing her job duties. Dr. Zane also was informed that Plaintiff's employer had characterized her job as sedentary, (see id. at 90), and he was provided with a job description for the position of "Nurse, Consultant," which apparently was obtained over the Internet from a Department

8

of Labor website, (see id. at 106.)

In an opinion dated July 10, 2002, Dr. Zane concluded that the record failed to establish a functional impairment that precluded Plaintiff from performing her job duties. (See id. at 123-24.)  After recounting Dr. Miller's observations, diagnoses, and treatments (and observing that "his office notes are very difficult to read"), and noting other portions of the medical record, Dr. Zane opined that "there are no objective findings or data referable to an impaired level of functionality."  (Id. at 124.)  Accordingly, he found that Plaintiff "would be capable of performing a sedentary occupation, allowing for reasonable rest periods and ergonomic equipment."  (Id.)

Based on this opinion and a review of the record, Defendant's Appeal Review Committee notified Plaintiff on July 17, 2002 that it was upholding the initial denial of her claim for short-term disability benefits.  (See id. at 128-29.)  The Committee explained that "there is a lack of medical evidence to support a functional impairment or the intensity and severity of [Plaintiff's] illness," such as "noted joint findings, decrease[d] range of motion, documented pain on movements, x-ray reports or abnormal exam findings," such that Plaintiff could be deemed unable to "perform[] the essential functions of [her] regular occupation."  (Id. at 128.)  Following this unfavorable disposition of her administrative appeal, Plaintiff now seeks judicial review of Defendant's denial of her claim for short-term disability benefits, contending that this decision was arbitrary and capricious.

### III. CONCLUSIONS OF LAW

9

**A.     The Standards Governing the Parties' Cross-Motions**

A participant or beneficiary of an ERISA qualified plan may bring suit in federal

district court to recover benefits due under the terms of the plan.  29 U.S.C. §

1132(a)(1)(B).  Courts review *de novo* a denial of benefits challenged under this

provision, unless the benefit plan confers upon the administrator the discretionary

authority to determine eligibility for benefits or to construe the terms of the plan, in which

case a more deferential "arbitrary and capricious" standard applies.  See Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); Yeager v.

Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996).

Here, the parties agree that the "arbitrary and capricious" standard governs the

Court's review, in light of the Plan provisions that expressly grant Defendant the full

discretion and authority to administer claims, determine whether a claimant has provided

satisfactory proof of an entitlement to benefits, and construe the terms of the Plan.  This

standard is the "least demanding form of judicial review," under which this Court must

uphold a denial of benefits if it is "rational in light of the plan's provisions."  Monks v.

Keystone Powdered Metal Co., 78 F. Supp.2d 647, 657 (E.D. Mich. 2000) (internal

quotation marks and citations omitted), aff'd, 2001 WL 493367 (6th Cir. May 3, 2001).

"When it is possible to offer a reasoned explanation, based on the evidence, for a

particular outcome, that outcome is not arbitrary or capricious."  Davis v. Kentucky

Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and

citations omitted), cert. denied, 495 U.S. 905 (1990).  "Before concluding that a decision

10

was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." Marchetti v. Sun Life Assurance Co., 30 F. Supp.2d 1001, 1008 (M.D. Tenn. 1998).

Nonetheless, Plaintiff argues that the Court's deferential review should be tempered somewhat by the existence of a purported conflict of interest. As this Court has elsewhere explained, while a plan administrator's possible conflict of interest does not warrant the outright abandonment of the "arbitrary and capricious" standard in favor of *de novo* review, this possible conflict "should be taken into account as a factor in determining whether the [administrator's] decision was arbitrary and capricious." Monks, 78 F. Supp.2d at 657 (internal quotation marks and citations omitted); see also Evans v. UnumProvident Corp., 434 F.3d 866, 876 (6th Cir. 2006). Where such a factor is present, "[t]he reviewing court looks to see if there is any evidence that the conflict in any way influenced the plan administrator's decision." Evans, 434 F.3d at 876.

In support of her claim of a conflict of interest, Plaintiff cites Plan provisions that seemingly indicate that Defendant both determines eligibility for benefits and is responsible for paying benefits. In particular, Plaintiff notes that the Plan defines a "disability" as "***our determination*** [of] a significant change in your physical or mental condition" that, among other things, leaves the claimant unable to perform the essential functions of her regular occupation. (Plan at 6 (emphasis added).) The Plan then provides that "***[w]e will pay the benefits*** shown in the Plan summary section" if a claimant is deemed "disabled" within the meaning of the Plan. (Id. at 16 (emphasis

11

added).)  Finally, the Plan states that the terms "we," "our," "ours," and "us" refer to the insurance company that issued the group disability insurance policy to Plaintiff's employer — namely, Lumbermens Mutual Casualty Company, the parent of the Defendant claims administrator, and the entity that filed briefs on Defendant's behalf with this Court.  In light of these Plan provisions, Plaintiff appeals to the principle, as recognized in a line of Sixth Circuit precedents, that "a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits."  Evans, 434 F.3d at 876 (citing cases).

Although Defendant attempts to distinguish these decisions, the Court is not persuaded.  In particular, Defendant observes that the same entity does not, in fact, determine eligibility for benefits and pay benefits under the Plan — rather, the parent company, Lumbermens, pays the benefits, while its subsidiary, Defendant, is the claims administrator that determines eligibility for benefits.  Yet, leaving aside the inconvenient fact that the ***Plan itself*** refers to a single entity as both determining eligibility and paying benefits, the courts have sensibly recognized that the interests of a parent and subsidiary "must be considered to be aligned" for purposes of determining the existence of a conflict of interest.  See Vega v. National Life Insurance Services, Inc., 188 F.3d 287, 295 & n.7 (5th Cir. 1999); see also Davis v. Broadspire Services Inc., No. 04-74792, 2006 WL 752602, at *12 (E.D. Mich. Mar. 23, 2006) (finding that a conflict of interest existed where the insurer, Lumbermens, both paid disability claims and selected the company that would make eligibility determinations under authority delegated by Lumbermens); Harris

12

v. Kemper Insurance Companies, 360 F. Supp.2d 844, 849 (E.D. Mich. 2005) (considering the very same "parent/subsidiary relation" that is present here as a factor in determining whether a denial of benefits was arbitrary and capricious). Accordingly, the Court will consider this conflict of interest as a factor in reviewing Defendant's determination under the "arbitrary and capricious" standard.

Finally, in reviewing Defendant's decision, the Court is "confined to the record that was before the Plan Administrator," and "may not admit or consider any evidence not presented to the administrator." Wilkins, 150 F.3d at 615, 619. The pertinent record, however, is not limited solely to the evidence before the administrator at the time of its initial decision, but also includes materials considered during the administrative appeals process. Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991).

**B.     Defendant's Denial of Short-Term Disability Benefits Was Not Arbitrary and Capricious.**

With the above standards in mind, the Court now turns to the benefit denial at issue here. In challenging this decision, Plaintiff principally contends that Defendant failed to give proper weight to the opinion of her treating physician, Dr. Bruce Miller. In addition, Plaintiff argues that the opinion of the peer review physician retained by Defendant, Dr. Sheldon Zane, is entitled to little or no weight, where he never met or examined Plaintiff, he purportedly applied criteria that differ from those dictated under the terms of the Plan, and he was provided with an allegedly inaccurate description of the essential functions of Plaintiff's job. The Court considers each of these contentions in

13

turn.

Plaintiff's principal challenge has been significantly undermined by intervening developments in the relevant case law.  Citing Darland v. Fortis Benefits Insurance Co., 317 F.3d 516, 532-33 (6th Cir. 2003), Plaintiff argues that this Court must defer to the opinion of her treating physician, Dr. Miller, "unless there is substantial evidence contradicting" this opinion.  Because Dr. Miller opined in May of 2002 that Plaintiff was unable to work and was likely to remain so for six to twelve weeks, Plaintiff contends that Defendant acted arbitrarily and capriciously by disregarding this opinion from her treating physician opinion, and by instead relying upon the opinion of a peer review doctor who never met or examined her.

As Defendant points out, however, this aspect of Darland is no longer good law. In Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003), the Supreme Court rejected the application of a so-called "treating physician rule" in the context of ERISA claims for benefits, holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."  While cautioning that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," the Court declined to "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Nord, 538 U .S. at 834, 123 S. Ct. at 1972 (footnote omitted).

Thus, "routine deference to the opinion of a claimant's treating physician is not

14

warranted" in the wake of <u>Nord</u>.  <u>See</u> <u>Kalish v. Liberty Mutual/Liberty Life Assurance</u> <u>Co.</u>, 419 F.3d 501, 508 (6th Cir. 2005) (internal quotation marks and citation omitted). Rather, this Court's task is to consider whether Defendant's decision rests upon reliable evidence and medical opinions, even though they might conflict with the views of Plaintiff's treating physician, or whether Defendant instead acted arbitrarily and capriciously by crediting unreliable evidence or relying on medical opinions that are unworthy of credence.  <u>See</u>, <u>e.g.</u>, <u>Vick v. Metropolitan Life Insurance Co.</u>, 417 F. Supp.2d 868, 877-81 (E.D. Mich. 2006); <u>Bauer v. Metropolitan Life Insurance Co.</u>, 397 F. Supp.2d 856, 864-66 (E.D. Mich. 2005).  As the Sixth Circuit has explained in the aftermath of <u>Nord</u>, a plan administrator generally does not act arbitrarily and capriciously in "choos[ing] to rely upon the medical opinion of one doctor over that of another," so long as the medical opinion favored by the administrator bears sufficient indicia of reliability.  <u>See</u> <u>McDonald v. Western-Southern Life Insurance Co.</u>, 347 F.3d 161, 169, 171-72 (6th Cir. 2003).

The dispositive question in this case, then, is whether Defendant acted arbitrarily and capriciously by favoring the opinion of Dr. Zane over that of Plaintiff's treating physician, Dr. Miller.  As noted, Plaintiff challenges Defendant's reliance on Dr. Zane's opinion on three grounds.  First, she argues that Dr. Zane's opinion should be substantially discounted, if not completely discredited, by virtue of his failure to actually examine her.  Yet, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  <u>Calvert v. Firstar Finance,</u>

15

Inc., 409 F.3d 286, 296 (6th Cir. 2005).  Instead, Dr. Zane's reliance on the medical

record rather than his own examination of Plaintiff is merely a "factor [to] consider in

determining whether a plan administrator acted arbitrarily and capriciously in giving

greater weight to the opinion of its consulting physician."  Kalish, 419 F.3d at 508.  "[I]f

a file review is otherwise thorough, the failure to examine a claimant is not fatal to a

denial decision."  Bauer, 397 F. Supp.2d at 866.

Plaintiff has failed to identify any aspect of the medical record that Dr. Zane failed

to consider or account for in arriving at his opinion.  There is no suggestion, for example,

that any relevant portion of Plaintiff's medical history or treatment record, whether from

Dr. Miller or any other physician or medical facility, was withheld from Dr. Zane, much

less that any such additional records might have led Dr. Zane to a different conclusion.

Neither has Plaintiff identified any specific defect in Dr. Zane's reading of the record

provided for his review.  To be sure, Plaintiff cites Dr. Zane's statement that he found Dr.

Miller's office notes "very difficult to read."  (Admin. Record at 124.)  Even so, she has

not pointed to any portion of these notes that Dr. Zane might have misread,[4] nor has she

suggested how a different interpretation of these notes might cast doubt on the reliability

of Dr. Zane's opinion.

-------

[4]To the contrary, it appears to the Court that Dr. Zane did an admirable job of
deciphering Dr. Miller's records.  Indeed, it was only with the benefit of his opinion that this
Court was able to make sense of certain of Dr. Miller's more illegible notations.  In any event,
since it is Plaintiff's burden to establish a disability within the meaning of the Plan, see Bauer,
397 F. Supp.2d at 864, it does not particularly aid her cause to note that the medical records she
provided for Defendant's (and this Court's) review are quite difficult to read.

16

Plaintiff next contends that Dr. Zane imposed criteria beyond those dictated by the Plan when he noted the lack of "objective findings" reflecting Plaintiff's "impaired level of functionality" as a result of her medical condition.  (Admin. Record at 124.)  This observation, in Plaintiff's view, runs counter to the Plan's definition of "disability," which does not mandate any such "objective findings."  The Plan, however, vests Defendant with the discretion to "interpret all policy terms and conditions," and to "[d]etermine whether proof of [a claimant's] loss is satisfactory" to warrant an award of disability benefits.  (Plan at 24.)  As Judge Lawson of this District has observed, "it is not unreasonable for a plan administrator to seek a medical or psychiatric explanation tying the conclusion that a claimant is disabled to some medical finding that supports it." Bauer, 397 F. Supp.2d at 865.  Moreover, because "the plan provisions at issue define disability in terms of functional limitations that prevent an employee from performing her job," the determination of Plaintiff's eligibility for benefits necessarily turns upon "an assessment of what [Plaintiff] can and cannot do, not what she does and does not suffer from."  397 F. Supp.2d at 865.

Viewed in this context of the Plan's definition of a "disability," Defendant permissibly relied upon Dr. Zane's observation regarding the absence of "objective findings or data referable to an impaired level of functionality."  As noted in Bauer, 397 F. Supp.2d at 865, it is not enough that Plaintiff produce evidence, whether in the form of treating physician records or otherwise, that she suffered from one or more recognized medical conditions.  Rather, she must produce evidence that these conditions rendered her

17

"disabled" within the meaning of the Plan by precluding her from performing the essential functions of her job.  See Vick, 417 F. Supp.2d at 880 (noting that the treating physicians in that case "explained how Plaintiff's condition functionally limited her capacity to work").

As Dr. Zane accurately observed, the record is virtually silent on this latter point. While Dr. Miller diagnosed Plaintiff as suffering from various conditions and prescribed various treatments, his records from the pertinent period fail to identify any resulting restrictions or limitations that might impair Plaintiff's ability to perform her job.[5]  At most, he noted only that certain activities tended to exacerbate Plaintiff's reports of pain — and, even then, Dr. Miller's notes on this point merely recount what Plaintiff told him, rather than reflecting his own findings based on testing or examination.  Under these circumstances, Defendant permissibly could have given little or no weight to Dr. Miller's conclusory statement that Plaintiff was "unable to work."  (Admin. Record at 62.)  By the same token, Defendant could properly rely upon Dr. Zane's conclusion, following his review of the medical record, that this record was devoid of any medical findings that would reflect Plaintiff's inability to perform the essential functions of her job.

Finally, Plaintiff contends that Dr. Zane's opinion is undermined by his reliance on a description of Plaintiff's job that may or may not have been accurate.  As Plaintiff

---

[5]Although Dr. Miller opined in January of 1998 that Plaintiff had a number of work restrictions, (see Admin. Record at 51), Defendant correctly points out that these findings have no relevance to the question of Plaintiff's ability to perform her job during the time frame at issue here, over four years later.

18

points out, Defendant relayed to Dr. Zane the "verbal" statement of Plaintiff's employer that her position was properly characterized as "sedentary."  (See Admin. Record at 123.) In addition, Dr. Zane was given a job description for the position of "Nurse, Consultant," which apparently was obtained over the Internet from a Department of Labor website. (See id. at 106.)  Because Plaintiff's correct job title was "Nurse Case Manager," and because there is no confirmation in the record that this position is properly characterized as sedentary, Plaintiff argues that the record fails to support Dr. Zane's opinion regarding her ability to perform the essential functions of her job.

Plaintiff's argument on this point, however, is more noteworthy for what it omits than for what it asserts.  In particular, Plaintiff has utterly failed to identify any tasks she performed as a nurse case manager that might have taken this job outside the "sedentary" classification.  Neither has she suggested how her position might have differed in any material respect from the "Nurse, Consultant" job description provided to Dr. Zane. Rather, Plaintiff simply invites the Court to speculate that the information supplied to Dr. Zane might have been inaccurate in some way, and that this, in turn, might have resulted in an opinion that is unworthy of credence.

Even assuming that such conjecture were warranted,[6] it would not support the

---

[6]Obviously, Plaintiff is in a position to advise the Court as to the duties she performed as a nurse case manager, and to identify any discrepancies between these duties and those included in the "Nurse, Consultant" job description provided to Dr. Zane.  Yet, she explains that she has been prevented from doing so under the rule that this Court's review generally is confined solely "to the evidence contained in the administrative record."  Wilkins, 150 F.3d at 618.

As Wilkins itself recognizes, however, there are exceptions to this general rule, such that

19

conclusion that Defendant's decision was arbitrary and capricious.  Again, as Dr. Zane

correctly observed, the record is devoid of any findings by any physician that Plaintiff's

medical condition left her functionally limited in any way.  Accordingly, no matter what

Plaintiff's precise job duties might have been, and no matter what level of exertion these

duties might have entailed, Dr. Zane equally well could have reached the same conclusion

— namely, that there was nothing in the record evidencing "an impaired level of

functionality."  (Admin. Record at 124.)  Consequently, any purported inaccuracies in the

job description provided to Dr. Zane are irrelevant to an assessment of the reliability of

his opinion.

      This leaves only the more general consideration, noted earlier, that Defendant

operated under a conflict of interest in light of the parent/subsidiary relationship between

the insurer that pays claims under the Plan and the claims administrator that determines

eligibility for Plan benefits.  While the Court agrees that such a conflict is present here,

Plaintiff has failed to identify any aspect of Defendant's determination or its

---

this Court may consider new evidence when necessary, for example, to support a claim of "an
alleged lack of due process afforded by the administrator."  150 F.3d at 618.  Arguably, if
Defendant relied upon an incorrect job description without affording Plaintiff an opportunity to
challenge its accuracy during the course of the administrative proceedings, this would provide a
sufficient basis for a motion to supplement the record.  See, e.g., Warshaw v. Continental
Casualty Co., 972 F. Supp. 428, 430 (E.D. Mich. 1997) (reasoning that a court should be free to
consider records that were available to the plan administrator during the administrative
proceedings but that the administrator "deliberately refused" to obtain); cf. Buchanan v. Aetna
Life Insurance Co., 179 Fed. Appx. 304, 308 (6th Cir. May 3, 2006) (finding that the district
court properly denied the claimant's motion to supplement the record, where he did not raise a
procedural challenge but merely asserted without support that "the record is flawed and not
developed properly").  Despite this available avenue, Plaintiff has failed to even attempt a
showing that the job description used by Defendant was inaccurate in some material respect.

decisionmaking process that might have been influenced by these competing interests. There is no indication, for example, that Defendant disregarded any portion of the record or "cherry-picked" only those elements of the record that would support a denial of benefits.  Nor, as explained above, is there any basis for questioning the reliability of the opinion offered by Defendant's chosen peer review physician, Dr. Zane.  Accordingly, in the absence of "actual evidence that the conflict of interest had some effect on the administrator's decision," Bauer, 397 F. Supp.2d at 867, the mere existence of this conflict does not render Defendant's determination arbitrary and capricious.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment — which, in accordance with Wilkins, supra, the Court construes as a motion to overturn the Defendant claims administrator's denial of benefits — is DENIED. IT IS FURTHER ORDERED that Defendant's motion for entry of judgment is GRANTED.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  September 8, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 8, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

21